### SOUTH COVINGTON & C. S. RY. CO. *v.* GEST.

*(Circuit Court, S. D. Ohio, W. D. March 31, 1888.)*

1. JUDGMENT—RES ADJUDICATA—WHO CONCLUDED.
    The trustee under a mortgage executed by a Kentucky street-railway corporation filed a bill in the chancery court of that state to foreclose. To these proceedings G., who resided in Ohio, and who was the manager and a large stockholder of the company, was made party by a "warning order," and an attorney appointed by the court to defend his interests, according to the laws of Kentucky. Pending suit, G. sold out his interest in the concern, including certain unpaid and overdue coupons secured by the mortgage which he warranted to be a first lien, to a purchaser who bought with the view, known to G. at the time, of bidding in the property and franchise at the foreclosure sale. The purchaser intervened, and set up the assignment from G., who did not appear, save as a witness in behalf of his assignee. The court ruled that the coupons had been paid, and that their holder was not entitled to come in under the mortgage. *Held*, in an action in the federal court in Ohio by the purchaser against G. for damages for breach of warranty, that the Kentucky court, being a court of competent jurisdiction, and the proceeding *in rem*, its finding as to the coupons was *res adjudicata*, and that G. was estopped to set up their validity as a defense to the action.

2. CORPORATIONS—BONDS AND MORTGAGES—COUPONS—PAYMENT.
    G. agreed with B., a bondholder, and also the largest stockholder in a street-railway company, to take his holdings if B. would put G. into control. B. thereupon got the company to give him its notes for $15,000, which was about the amount of its pressing debts, in consideration for which he undertook to pay off the outstanding claims. These were made up in the main

of mortgage coupons, and the understanding was that B. was to hold these coupons, when taken up, as collateral security, and that, as fast as the notes were paid, coupons to a proportionate amount were to be surrendered. G. was then installed as manager, and the notes turned over to him. He raised the money on them, and paid it to B., who then gave him the coupons. Of these coupons—313 in number—but 192 belonged to B.'s bonds. The remainder had been paid when presented at the company's office, but they had passed into B.'s hands without the knowledge or consent of the former holders. G. took up the notes for $15,000 as they fell due, and the company then paid him the difference between their value and that of the coupons in consideration of their surrender, it being agreed that the coupons should thereafter belong to G. absolutely. *Held*, that as against the other bondholders secured by the mortgage, the coupons had been paid, and that G., who had sold them with a warranty that they were a lien under that mortgage, was liable in damages to the purchaser for a breach thereof.

3 SAME—CONFUSION OF ACCOUNTS.

After G. had gotten control of the company, as indicated, he chose his own directors, in the main from his own family and his clerks, and exercised absolute and exclusive authority over its finances and business for many years. He kept no separate account in bank of the company's funds, but deposited all money earned by it to his own individual account, and paid coupons and current bills that were presented for settlement in cash or in checks drawn upon the same account. *Held*, in the absence of proof that the moneys used to take up the coupons were individual funds, and in view of the fact that those who presented them for payment did so under the belief that they were to be canceled, that the coupons had been paid, and that G., who had sold them with a warranty that they were a lien under the mortgage executed to secure the bonds from which they were cut, was liable in damages to the purchaser for a breach thereof.

4. SAME—ADVANCES BY PRESIDENT—RESOLUTIONS OF DIRECTORS.

The president of a street-railway company, who was practically its sole owner, sold certain of its mortgage coupons under a warranty that they were unpaid. As a matter of fact they had been paid by the corporation, but the president, claiming to have advanced the money to pay them out of his own funds, procured the passage of a resolution by the directors who were controlled by him, subrogating him to the rights of the original holders. *Held*, in an action for breach of the warranty, that the resolution was no defense; its recitals being false, and entitled to no more weight than the statements of the president himself to the same effect.

5. JUDGMENT—ASSIGNMENT—SALE.

An agreement for the sale of the vendor's interest in a street-railway company recited that he "hereby sells and agrees to deliver * * * the following securities: Three judgments against said company for $4,703.35, $1,282.12, and $1,029.53, respectively, which have been paid by him, and which he now holds against the company," reciting the facts as to said judgments fully and correctly. The first two amounts represented money which the vendor, who was largely interested in the company, had paid a surety on the company's appeal-bond, who had been compelled to make them good. The surety had thereupon assigned and transferred to the vendor "all right, title, and benefit in and to the said sum." The last amount was a partial payment made by the vendor on a judgment against the company. The agreement contained no warranty as to these judgments. *Held*, that the fact that the judgments had not been entered to the use of the vendor was not ground for recovery of damages by the vendee.

6. SALE—BREACH OF WARRANTY—DAMAGES.

In an action for a breach of warranty in the sale of mortgage coupons, where there is no evidence as to the market value of the coupons at the date of sale, the price paid by the purchaser will be considered the market price, and that is the measure of damages.

7. SAME—DECEIT—DAMAGES.

In an action to recover damages for fraudulent misrepresentation and concealment of material facts in the sale of mortgage coupons, the price paid by the purchaser with interest thereon is the measure of damages, where there is no evidence as to the market value of the coupons at the time of sale.

8. LIMITATION OF ACTIONS—EXCEPTIONS—FRAUD.

 In Ohio, "limitations" is not a good plea to an action to recover damages for fraudulent misrepresentation and concealment of material facts in the sale of mortgage coupons, where the suit was commenced within four years after the fraud was discovered.

At Law.

*Simrall & Mack* and *John C. Benton*, for plaintiff.

*George Hoadly* and *Remelin & Remelin*, for defendant.

JACKSON, J. This is a suit to recover damages for breach of warranty and for fraudulent misrepresentations by defendant in the sale to plaintiff of 768 coupons of the first mortgage bonds of the Covington Street-Railway Company, and of certain judgments against said company. The intervention of a jury having been waived, the cause was tried by the court under a stipulation of parties, made part of the record, which requires the court to make a special finding of the facts, on which its judgment shall be rendered. In conformity with that requirement, the court, after a careful examination of the evidence, finds the material and relevant facts to be as follows, viz.:

*First.* After negotiations commenced in the summer of 1881, and continued through the fall of that year, a certain contract was completed and executed between the parties therein named as follows:

"This agreement, made and entered into this 17th day of February, 1882, by and between Erasmus Gest, party of the first part, Anthony D. Bullocn, E. F. Abbott, John A. Williamson, and John G. Isham, of the second part, and William A. Goodman, of the third part: Witnesseth, that the party of the first part hereby sells and agrees to deliver, as hereinafter specified, to the party of the second part, the following securities: (1) 1,677 shares (which said Gest guaranties is the majority) of the capital stock of the Covington Street-Railway Company, each of the par value of one hundred dollars. (2) 768 past due and unpaid coupons cut from the first mortgage bonds of said company, each for thirty-five dollars. Some of these coupons, having been mislaid, are to be delivered with the others as soon as found, and the said Gest agrees to make a thorough search for them at once. In case of the failure to find them, he assigns his right to collect them, and guaranties that such right is perfect, and agrees to indemnify the party of the second part against any liability to their production and claim of ownership by others, and to furnish them sufficient evidence of his ownership of the same, by his own oath or otherwise, at any time upon demand. The amount of such mislaid coupons does not exceed $3,500, exclusive of interest. The total amount of accrued interest on the 768 coupons is computed approximately at about $8,159 on the 1st of October, 1881. (3) Decree against Malcolm McDowell and others, for purchase money of stable lot, and for sale thereof, which said Gest now holds against the company, amounting in all to $2,551.05, upon which interest to the 1st of October, 1881, to-wit, $1,652.35, being added, makes the amount of the decree on that date $4,203.40. (4) Lot on Pike street, near Lewisburgh, purchased at the cost of five hundred dollars from one Perkins. (5) 78 mules and horses now in use upon the Covington Street-Railway, or in the stables of said company; original cost being $10,212. (6) Judgment in favor of Amos Shinkle, trustee, against said company, on the past due coupons, case No. 1,397, Kenton chancery court, for $1,282.12, which has been paid by said Gest, and which he now holds against the company,

which, with interest to October 1, 1881, amounts on that day to $1,302.95.
(7) Judgment in favor of the city of Covington against said company for
$1,029.53, with interest from June 25, 1881, which has been paid by said
Gest, and is now held by him against said company.    (8) Judgment in favor
of Amos Shinkle, trustee, with interest from November 18, 1881, $4,703.35,
against said company, which has been paid by said Gest, and is now held by
him against said company.    (9) Claim of E. Gest against the Covington
Street-Railway Company for that part of moneys advanced by said Gest in be-
half of the company, and paid in settlement of license claim with the city so-
licitor, Clement Bates, which was fairly chargeable to the Covington Street-
Railway Company, estimated approximately at the sum of $1,200.    (10) Bonds
of the Covington Street-Railway Company, secured by mortgage to A. S. Win-
slow, trustee; principal $40,000, with all interest thereon, none having been
paid.    These bonds are transferred without recourse upon Erasmus Gest.
(11) Cash due Erasmus Gest on current account January 1, 1882, $1,922.48.
The foregoing property is to be transferred and delivered to William A. Good-
man on the 1st day of March, 1882, or on the first day thereafter that said
Gest's counsel, George Hoadly, may be in the city of Cincinnati, able to at-
tend to business, if said Gest, on account of the absence of said counsel on
said 1st day of March, shall desire to postpone said delivery until the return
of said counsel.

"In consideration of the premises, said parties of the second part agree to
pay to said Gest in money on March 10, 1882, the sum of thirty-five thousand
dollars, less whatever part, if any, of the said sum of $1,922.48 said Coving-
ton Street-Railway Company may have repaid to said Gest in the course of its
current transactions with him before or on March 1, 1882.    In further con-
sideration of the premises, said parties of the second part agree that immedi-
ately after the adjournment of the present session of the Kentucky legislature
they will cause all the property, real and personal, wheresoever situated, and
of whatsoever composed, of the Newport Street-Railway Company to be con-
veyed to the South Covington & Cincinnati Street-Railway Company, free
from all debts and incumbrances, and by a perfect title, except to the extent
of fifty thousand dollars bonded debt outstanding against the same, and that,
at the time of such sale and conveyance, the South Covington & Cincinnati
Street-Railway Company shall execute and deliver to William A. Goodman,
as trustee, its deed of mortgage, properly executed and recorded, conveying
by a perfect title, except as aforesaid, all its property, real and personal,
wheresoever situated, and of whatsoever composed, including such property
so acquired from said Newport Street-Railway Company, in trust to secure
the punctual payment of the principal and interest of its two hundred and
fifty bonds, for the principal sum of one thousand dollars each, dated March,
A. D. nineteen hundred and twelve, (1912;) said bond and mortgage to be in
a form satisfactory to the counsel of said Gest.    Of these bonds, fifty, with
the coupons thereon, shall be retained by said Goodman, trustee, to be ex-
changed from time to time, and so as to bring about the extinguishment and
cancellation of the present mortgage debt of the Newport Street-Railway
Company, which said parties of the second part agree to procure to be done as
soon as practicable.    Twenty-five of said bonds, with the coupons thereon, are
to be delivered to said Erasmus Gest, and the remaining one hundred and sev-
enty-five of said bonds, together with all the securities transferred by said
Erasmus Gest, are to be held by said William A. Goodman, trustee, in escrow,
upon the following terms and conditions, viz. :    The whole of said bonds, ex-
cept as hereinafter stated, and of said securities, are to be held by said Goodman
—(1) As security for the payment to said Erasmus Gest of the sum of thirty-
five thousand dollars, with interest from the 1st day of March, 1882, within
six months from the day of the adjournment of the Kentucky legislature; but

the said Goodman may permit said horses and mules to be used by said purchasers, they exercising ordinary diligence in the care thereof. (2) Upon the completion of such payment to said Gest of said sum of thirty-five thousand dollars and interest, the residue of said bonds, except as hereinafter stated, and all of said securities so transferred by said Gest, are to be transferred by said Goodman to the South Covington & Cincinnati Street-Railway Company as its absolute property. (3) The parties of the second part having given, contemporaneously with the execution of this paper, to the said Gest, an option for the exchange of other coupons not held by him, secured by the first mortgage of the Covington Street-Railway Company for cash and bonds of the South Covington and Cincinnati Street-Railway Company, as in said agreement of option is more specifically described, it is agreed that, notwithstanding the provisions aforesaid for the security of said Gest, said Goodman may deliver out of said one hundred and seventy-five bonds any which may be required by the terms of said option, in case the same shall be exercised in whole or in part."

"In consideration of the premises said Gest agrees and undertakes that the property of the Covington Street-Railway Company, so far as he knows or believes, is free from indebtedness, except that transferred by him by the terms of this contract, and as follows: (1) First mortgage for the principal sum of $100,000; also coupons, including those due January 1, 1882, and including interest to that date on the past due coupons to the approximate amount, believed by him to be correct, of thirty-five thousand five hundred and ninety-eight dollars ($35,598.) (2) A disputed claim pending in the court of appeals, on behalf of the city of Covington for about six hundred dollars, against which said parties of the second part are to protect the surety for said company. (3) A claim pending on appeal in the court of appeals, for a trustee's fee,—about one hundred dollars,—against which said parties of the second part are to protect the surety of said company. (4) Part of the first item above—$35,598—is embraced in a suit recently brought by Charles W. West, in the circuit court in Kenton county, which is not additional to the said first item. (5) Whatever court costs may be due upon the lawsuits pending or determined in Ohio and Kentucky in which the said Covington Street-Railway Company is or has been engaged. (6) Whatever claims lawfully exist, all of which are disputed by said Gest, in behalf of the city of Cincinnati, or of the city of Covington. (7) Amounts due on current account to the Cincinnati Street-Railway Company, or for supplies, which said Gest agrees is less than the amounts due to the Covington Street-Railway Company from the Newport Street-Railway Company, the Cincinnati Street-Railway Company, and the amount of supplies on hand. (8) Said Gest will pay all sums due from the Covington Street-Railway Company to its lawyers in Kentucky and Ohio for their services and expenses up to March 1, 1882, and the several pending litigations in which said company is now engaged shall thereafter be controlled by the party of the second part free from any claim for lawyers' fees and expenses up to that day, but without recourse upon said Gest for any lawyers' fees or other expenses after said day. Said William A. Goodman agrees to accept the trusts aforesaid, and to perform the duties thereby required, together with those imposed upon him by this contract.

"In witness whereof the said parties herein above first named have hereunto, and to a duplicate hereof, set their hands and seals the day and date hereinabove first written.

[Signed]

| "E. GEST. | [Seal.] | W. A. GOODMAN. | [Seal.] |
| "E. F. ABBOTT. | [Seal.] | JOHN A. WILLIAMSON. | [Seal.] |
| "A. D. BULLOCK. | [Seal.] | JOHN G. ISHAM. | [Seal.] |

"In presence of GEO. HOADLY."

While the negotiations, which terminated in said contract of February 17, 1882, were pending, Gest sent to the agent of plaintiff a list of the property, rights, and interests which he proposed to sell, fixing a valuation on each item thereof, which together aggregated about or a little over $90,000. The sale and purchase were of specific articles or specially designated and described property, on each item of which a separate and distinct valuation was placed; and by the terms of the contract there was to be paid for the 768 coupons of $35 each and interest thereon, the sum of $35,039, and for the three judgments in question the sum of $7,079.52. No valuation was placed upon the $40,000 bonds of the company, referred to in the tenth claim of the contract as the "Winslow Mortgage Bonds." They were never in fact issued by the company, and did not belong to said Gest, nor were they sold by him. He held them for the company, and simply turned them over for the protection of the purchasers against the accident or contingency of their getting into the hands of innocent holders.

*Second.* The evidence established, and the court so finds, the fact that in this contract with and purchase from said Gest, the said Abbott, Williamson, Bullock, and Isham were acting as the agents and for the benefit of the South Covington & Cincinnati Street-Railway Company, which was the real principal in the transaction, and that this was known to and understood by said Gest. Said contract was fully performed by said purchasers, the South Covington & Cincinnati Street-Railway Company, (except in one particular, relating to the indemnity of a surety on an appeal-bond of the Covington Street-Railway Company, which Gest subsequently paid, and which he sets up as an offset or counter-claim in connection with a claim for $300 on past due coupons cut from bonds issued by plaintiff.) Said Gest accepted this performance by and from the South Covington & Cincinnati Street-Railway Company. The court accordingly finds that the plaintiff, as the real principal in said contract, has the right to maintain this suit, and in so doing is not asserting a derivative right acquired by transfer or assignment from said Abbott, Williamson, Bullock, and Isham, as claimed by defendant.

*Third.* Prior to the execution of said contract, Amos Shinkle, the trustee under the mortgage made by the Covington Street-Railway Company in 1867, to secure its first mortgage bonds and interest thereon as the same matured semi-annually on January 1st and July 1st each year after their issuance, had in December, 1881, at the instance of certain holders of past due coupons, instituted a foreclosure suit in the chancery court of Kenton county, Ky., against said Covington Street-Railway Company, which was a corporation chartered and organized under the laws of Kentucky, was located in the city of Covington, and was invested with full authority to issue its bonds, and secure their payment by mortgage upon its property and franchises. The bonds issued by it in 1867 were 100 of $1,000 each, with interest warrants or coupons attached, at the rate of 7 per cent. per annum, payable semi-annually on above dates at the Bank of America, New York. Said E. Gest, together with all other

known and unknown holders of first mortgage bonds or coupons of said company, who were or might be entitled to share in the proceeds of the mortgaged property, were made defendants in said foreclosure proceedings. Gest, being a non-resident of Kentucky, residing at Cincinnati, Ohio, was not personally served with process, but under and in conformity to the laws of Kentucky the court made a "warning order" as to him, and appointed an attorney to represent him and his interests in the suit, and he was duly notified on or about December 3 or 4, 1881, of the proceeding and of the appointment by the court of an attorney to represent him, but he took no steps in relation to the suit. It was fully understood by said Gest and by the representatives of the South Covington & Cincinnati Street-Railway Company, with whom he was negotiating said sale of his interests in said Covington Street-Railway Company, that this suit by the trustee, Shinkle, would result in a foreclosure of the latter's mortgage, and the sale of its property and franchises. It was also understood by said Gest that the object and purpose of the South Covington and Cincinnati Street-Railway Company in purchasing his 768 coupons "as past due and unpaid coupons cut from the first mortgage bonds" of said company, then being proceeded against, was to obtain and secure as many and as large an amount of liens on the mortgaged property as possible (with the view and to the end of becoming the purchasers thereof at the foreclosure sale when made.) This was also the object and purpose in buying the three judgments included in the contract, two of which were founded or based upon past due coupons. After acquiring said 768 coupons and judgments under the contract of February 17, 1882, the South Covington & Cincinnati Street-Railway Company, in proper time and manner, as the assignee of said Gest, duly intervened in said foreclosure proceedings, and set up its rights as a lien claimant by virtue of said coupons and judgments so bought of E. Gest. The holders of other bonds and unpaid coupons contested the validity of said liens as against the property or themselves. Said E. Gest was examined as a witness on behalf of the South Covington & Cincinnati Street-Railway Company, and in support of its claim to an equality of lien on the mortgage property with other holders of bonds and coupons. He testified as to his connection with the mortgagor company, and generally as to how he had acquired said 768 coupons and judgments. Other testimony was taken on the subject, and the special commissioner to whom the matter was referred, on November 9, 1883, filed his report in the cause, to the effect that said judgments and said 768 coupons were not valid and concurrent liens on the mortgaged premises with the bonds and coupons held by other parties to the cause, and said report was duly confirmed by the court. The mortgage was duly foreclosed, and the proceeds of sale were distributed *pro rata* on the bonds and coupons recognized and declared liens by the court, to the exclusion of said 768 coupons and judgments sold by said Gest to the South Covington & Cincinnati Street-Railway Company. Gest's testimony in that cause first disclosed to the plaintiff and its agents the manner in which he had obtained the possession of said 768 coupons.

*Fourth.* Pending the negotiations for their purchase, he had not informed Williamson, Abbott, Bullock, and Isham or any agent of plaintiff, how he had acquired said coupons. He stated that no questions were asked him on that subject; that no necessity arose for his telling; and that "for me to have told him [Williamson] would have been to obtrude upon him something that would not suggest itself to me, and wholly unnecessary." He represented to the agents of the purchaser during the pendency of the negotiations for their sale and purchase that they were valid and unpaid obligations of the Covington Street-Railway Company; that they were the coupons of the first mortgage bonds of the company, and that they were the same kind of liens as were the first mortgage bonds. When these representations were made, on which plaintiff relied, and closed the purchase, with the view and for the purpose of enforcing them as liens on the mortgaged property,—which purpose was known to the defendant,—the said Gest, as he now states "really didn't believe that they were a first lien," but were only a valid indebtedness, "good in common with any other floating debt of the company." The fact is established that he withheld for the purchaser the information on which this belief as to their not being first liens was based, and which proved to be well founded where the effort was made to enforce them as such; and that, while suppressing this important fact, known to himself, but not to the buyer, he made affirmative representations, not merely as to their validity as a debt against the company, but as to their being unpaid coupons, and having the same kind of lien as the first mortgage bonds. The court finds that these representations were made and were untrue; that they misled the purchaser, and formed an inducement to his purchase; that said Gest did not believe said coupons were first liens, or any liens, upon the mortgaged premises; that he was fully aware of the facts which deprived them of their lien right as against other holders of bonds and unpaid coupons; and that, in the concealment of these facts, and in the making of representations that they were first liens, contrary to his belief, he committed a fraud upon the purchaser. This fraud was not discovered by the plaintiff until the fall of 1883, when the testimony of said Gest and others was taken in the foreclosure proceeding. The court further finds that the description of the 768 coupons in item second of the contract as "past due and unpaid coupons cut from the first mortgage bonds of said company," read in the light of the surrounding circumstances, and the object of their purchase, constituted a warranty that they held the same position towards the company and the mortgaged property as other outstanding overdue coupons of said bonds, and stood upon the same footing in respect to the lien of the mortgage made to secure their payment. The plaintiff understood the representation as meaning that these "unpaid coupons cut from the first mortgage bonds" were of the character that entitled them to share equally with all others in the security provided by the mortgage. The defendant knew, or had every reason to suppose, that the plaintiff or its agents understood the terms in that sense. If this language was of doubtful import, the court would give to it that construction and meaning which de-

fendant knew plaintiff placed upon it, under the well-settled rule that, where the language of a promisor or vendor may be understood in more senses than one, it is to be intended in the sense in which he has reason to suppose it was understood by the other contracting party. Whether given words are used in an enlarged or a restricted sense, other things being equal, that construction should be adopted which is most beneficial to the party acting upon them. Every intendment is to be made against a construction of a contract which would enable one party to entrap another, or create a snare. *White* v. *Hoyt*, 73 N. Y. 505; *Hoffman* v. *Insurance Co.*, 32 N. Y. 405; *Potter* v. *Berthelet*, 20 Fed. Rep. 240; and *Smeltzer* v. *White*, 92 U. S. 395. The court finds that said 768 coupons were not unpaid coupons entitled to share equally with other past due coupons in the mortgage security; that, as against other bonds and coupons outstanding, they constitute no lien upon the property and franchises mortgaged; and that they were, when sold by defendant, and are now, wholly worthless, and of no value as lien securities against the Covington Street-Railway Company, either to plaintiff or any one.

These facts are established both by the decree of said Kenton chancery court denying the right to share in the proceeds of the mortgaged property, on which the court held they were not liens, and by the evidence in the present suit.

1. As to the foreclosure proceedings and decrees therein. The chancery court of Kenton county, Ky., had full and complete jurisdiction of the subject-matter of the suit, which sought no personal decree against said Gest, who was made a party defendant, and duly notified of the proceedings, and of the fact that the court had, in conformity to law, appointed an attorney to represent him and his interests in the mortgaged property. In such foreclosure suits, which are in the nature of proceedings *in rem*, the priority of liens is a proper matter to be settled by the court. Adverse rights between co-defendants may be determined in such cases by the court, and a party who had an opportunity to assert his rights will be bound by the decree. *Corcoran* v. *Canal Co.*, 94 U. S. 741. Gest, having been made a defendant, had the right to make defense, file pleadings, examine and cross-examine witnesses, and appeal from the judgment of the court relating to and affecting his interests in the subject-matter. He was actually examined as a witness in the cause in support of the validity or concurrent lien of coupons he had sold and warranted to plaintiff as first mortgage liens, and which he knew were then being contested and disputed by other lienholders. He was in complete privity with the proceedings,—was fully represented therein by attorney duly appointed, and by his assignee, who purchased *pendente lite*, and then intervened, set up and asserted *bona fide*, so far as the record discloses, the very rights and interests which said Gest had claimed and sold. Under such circumstances Gest is not to be regarded as a stranger to the cause. Being made a defendant, being directly interested in the subject-matter of the suit so far as related to the liens of the coupons he held at the date of its commencement, and thereafter sold with warranty, having full knowledge of its pendency, and knowing that the lien right

or claim of his vendee was disputed, it would seem that, under the principle laid down in *Robbins* v. *Chicago*, 4 Wall. 657, he should be concluded by the decree in that cause on the the question as to whether said 768 coupons were unpaid or constituted valid liens on the mortgaged property of equal rank with other past due and unpaid coupons. The principles announced in *Pennoyer* v. *Neff*, 95 U. S. 714, are not in conflict with this conclusion.

But aside from the decree in that foreclosure proceedings, and assuming that the action of the court in excluding said 768 coupons from participation in the mortgaged property is not conclusive of the question as to their not being unpaid or non-lien coupons, the evidence in the present case on that subject establishes the fact that they were not acquired, held, and owned by said Gest in a way to entitle him or those deriving title from him to claim or assert them as valid and subsisting liens on the mortgaged property of the company as against other holders of first mortgage bonds and unpaid coupons thereof. The court finds that 313 of said coupons were obtained by said Gest in the manner and under the circumstances following, viz.: In September, 1870, C. S. Bushnell, who owned a majority of the Covington Street-Railway Company's stock, and 48 of its first mortgage bonds, held 192 unpaid coupons belonging to his own bonds, and 110 coupons which had been taken up by C. R. Russell, the secretary and treasurer of the company, with funds advanced by said Bushnell. These 110 coupons were not sold or transferred by the holder, who presented them at the company's office for payment, and received the money on them from its said treasurer without any knowledge or information, so far as the record shows, and as most of them swore, that said Russell was assuming to take them up for said Bushnell. Aside from his own 192 coupons there were then outstanding for the years 1869 and 1870 only 11 coupons, which matured July 1, 1870, held by C. H. Kellogg. The company at this time was indebted to M. M. Benton in the sum of $150, and to A. L. Greer $1,389.36, being a balance on lot purchased of him, and which he was then seeking to enforce by said suit in the circuit court of Kenton county, Ky. In this condition of affairs said Bushnell and the defendant entered into an arrangement by which it was agreed that Gest should purchase Bushnell's stock, (about 1,677 shares out of a total of 2,500,) provided it could be so arranged that said Gest should have the entire and absolute control of the company, and the benefit of such paper as Bushnell could obtain from the company with which to take up its debts then outstanding. Bushnell thereupon proposed to the company, which he really controlled, that he would provide for its outstanding liabilities, if the company execute and deliver to him its three negotiable promissory notes for $5,000, each, payable in two, three, and four years, respectively, and would appoint Erasmus Gest its superintendent, treasurer, and general managing agent. The company accepted this proposition October 3, 1870, and on the same day, by formal resolutions of its board of directors, appointed said Gest its superintendent, treasurer, general managing agent, and defined his duties as follows:

"Said E. Gest is to have entire control of the receipts and disbursements of the moneys of the company, as well as general management of the road, and while so acting it shall be his duty to take proper care of all the property placed under his care and in his control; from time to time to employ suitable and capable persons to discharge all the duties necessary for the aforesaid case and the economical operating of the railroad of said company. He shall keep accurate accounts of all moneys by him or those under him and of all the moneys expended by him on account of the operating of said road, and make full report thereof in writing to the board of directors of said company as often as once every four months. And he shall hold any net surplus, after discharging liabilities, including coupon interest as it falls due, subject to the order of the board. Said notes (for $5,000 each) to be delivered upon the delivery of said Bushnell to this company an agreement to take up and hold the coupons and floating debt as collateral to said notes, and he shall surrender the evidences of the payment of the floating debt as fast as the said notes shall be paid off, and shall deliver coupons in proportion as fast as paid off. The agreement of the said Bushnell shall specify the debts assumed to be paid and the amount of each debt."

The company executed its three notes for $5,000 each at two, three, and four years, bearing 7 per cent. interest, payable to its own order, which were properly indorsed and delivered to said Bushnell, who contemporaneously therewith, executed and delivered to the company his written agreement and undertaking, as follows:

"Know all men by these presents, that on this 3d day of October, A. D. 1870, the Covington Street-Railway Company has executed three (3) notes of five thousand dollars ($5,000) each, payable to its own order, and indorsed by said company, and due respectively in two, three, and four (2, 3, and 4) years from this date, bearing seven (7) per cent. per annum interest, payable semi-annually at the Bank of America in New York city, and delivered the same to C. S. Bushnell, of New Haven, in the state of Connecticut, in pursuance of a proposition to the said railway company by said C. S. Bushnell, and accepted by said company at a meeting of its board of directors this day held, whereby said Bushnell proposes to take up and hold for redemption fifteen thousand dollars ($15,000) of the present indebtedness of said railway company, to be surrendered to said company from time to time as said notes are paid off.

"In pursuance of said agreement, and in consideration of the execution and delivery to him of said three (3) notes, said C. S. Bushnell now hereby agrees and binds himself with and to said street-railway company at once to pay off and take up the following debts of said railway company to-wit: 65 coupons due January 1, 1869; 100 coupons due July 1, 1869; 48 coupons due January 1, 1870; 100 coupons due July 1, 1870; 313 coupons in all of $35 each, and the interest now due on said coupons since their maturity; and also a debt now sued upon in the Kenton circuit court of Covington, Ky., by A. L. Greer, amounting to the sum of $1,389.36, and also to Mr. M. M. Benton the sum of $150,—in all amounting, by calculation, this day to the sum of fifteen thousand dollars ($15,000.) Said Bushnell is to be allowed to hold said coupons or portions of them as hereinafter set out as collateral security for the payment of said notes, but said coupons are to be surrendered as follows: Said Bushnell binds himself to surrender to said company, upon payment of the first notes aforesaid, evidence of the payment of the said debts and coupons amounting to the sum of five thousand dollars, ($5,000,) and upon the payment of the second note, others of the said coupons amounting to the sum of $5,000, and upon the payment of the third note, the entire bal-

ance of said coupons, in all said debt and coupons amounting as of this date to the sum of fifteen thousand dollars ($15,000.)

"In witness whereof, I, the said C. S. Bushnell, have hereunto set my hand and seal this 3d day of October, A. D. 1870."

When said contract was executed, and the notes delivered, which appears to have been done on October 3, 1870, the following entry was made on the company journal:  .

"Sundries to bills payable, $15,000; real-estate account, $1,389.36; expense account, $150; past due coupons account, $13,460.64. Gave C. S. Bushnell three notes at 2, 3, and 4 years from October 3, 1870, payable to the company's order, and indorsed in blank by the president and secretary, for $5,000; the notes drawing interest at 7 per cent. per annum, payable semi-annually at the Bank of America, New York; proceeds to be applied as above."

In pursuance of their previous understanding and agreement, the notes of $5,000 each so issued by the company and delivered to Bushnell, were then indorsed by said Gest individually, and used in raising the $15,000, which formed the consideration he was to pay Bushnell for his stock and interest in the company. On the 14th of October, 1870, said Bushnell, through C. R. Russell, the late secretary and treasurer of the company, turned over to said Gest 254 of the aforesaid coupons, gave a due bill for the 48 coupons of January 1, 1869, which were then in the east, and also gave him $385 in money or check to take up the 11 Kellogg coupons of July 1, 1870, making the 313 coupons which by the contract Bushnell was to take up and pay off. The 11 coupons of July 1, 1870, were paid said Kellogg by the proper officers of the company, and regularly entered upon the books of the company as paid by it. These 11 coupons were never sold or assigned by Kellogg, nor were they ever purchased either by Bushnell or Gest. These 313 coupons for the years 1869 and 1870 were not sold by Bushnell to E. Gest, but were turned over to him under this agreement, as the party who was to take up said three notes for $5,000 as they matured. Gest was fully informed of the contract between the company and said Bushnell, under and by the terms of which the proceeds of the notes were to be applied in taking up and paying off the company's outstanding liabilities, including said 313 coupons. These notes were subsequently, at their respective maturity, taken up by said Gest. The interest thereon was paid by the company; and, after being taken up by said Gest, he collected from the company interest thereon at the rate of 8, 9, and 10 per cent. semi-annually until October 31, 1876, when an agreement between said Gest and the company was made, as follows:

"In the matter of the indebtedness of the company to C. S. Bushnell in the sum of $15,000 evidenced by three promissory notes of $5,000 each, dated October 3, 1870, and payable in one, two, and three years from their dates respectively, it was agreed that the holder of said notes should surrender them up to the company for cancellation, in consideration of the payment to him by the company of the sum of twenty-five hundred and five dollars and sixty-four cents in cash, being the difference between the value of the said notes and the securities heretofore held by him as collaterals for the payment of

said notes, (said notes intended to cover the floating debt of the company at that time;) said securities being 313 coupons of the company's bonds of $35 each, amounting to ten thousand nine hundred and fifty-five dollars, ($10,-955;) also a note made to A. L. Greer, secured by mortgage on the stable lot for thirteen hundred and eighty-nine 36-100 dollars; and the Benton claim against the company of one hundred and fifty dollars, paid by the company. Said coupons and mortgage claimed to be held by him absolutely from this date, and not collaterally as heretofore. The interest on these 313 coupons paid to this date."

The said notes were thereupon surrendered by said Gest to the company, and the 313 coupons were thereafter claimed by him as his absolute property. While said notes were outstanding, and before their maturity, it is clear that the 313 coupons in the hands of said Gest, and obtained under the circumstances stated, constituted no liability against the company, much less a lien on the mortgaged property as against other holders of its first mortgage bonds or coupons thereof. Bushnell had realized money on the notes, nor is it at all material that the money thus realized formed to some extent or entirety the consideration for the sale of his stock, as between him and said Gest; and this money in his hands was applicable to the payment of said 313 coupons which he undertook to pay off with the proceeds thereof. With the receipt of that money said coupons, as between him and the company, were paid. The coupons were not turned over to the party or parties who purchased or discounted and held the notes before maturity, but they were delivered up to E. Gest, who was then the sole managing and financial agent of the company, and the proper officer to receive and cancel the same as no longer subsisting liabilities of the company. When therefore, on October 31, 1876, he made the arrangement with the company to surrender the notes and hold the coupons absolutely, they constituted nothing more than newly-issued evidences of debt. Other holders of first mortgage bonds and outstanding coupons due or to become due could not be affected by the substitution, nor could said coupons be reinvested with the lien, which had once ceased, even for a moment, to exist. If the company had placed in Bushnell's hands $15,000 in cash, to apply as he contracted to apply the proceeds of the company's negotiable notes, and the transaction had been conducted precisely as it was, there could be no doubt that when the coupons to be taken up with such funds came into his hands or the hands of Gest, they should *eo instante* be regarded as paid. The giving of negotiable paper on which to raise such funds—which paper is used by Bushnell without incurring any personal liability therefor or thereon—in no way changes the principle, or distinguishes the case from that of placing actual money in his hands. The court accordingly finds as a fact established by the evidence that said 313 coupons were not unpaid coupons of the first mortgage bonds of said company; that they constituted no lien upon its property and franchises mortgaged to secure said bonds and interest, especially against other holders of bonds and unpaid coupons; and that in their sale by defendant to plaintiff they were not only warranted to be unpaid and subsisting liens, but were so represented to plaintiff's agents during the negotiations

for their purchase, contrary to defendant's actual belief under a knowledge of the facts which fully justified his opinion, and which were not disclosed.

The remaining 455 coupons, included in the 768 sold to plaintiff under the contract of February 17, 1882, are fully identified by the agreement of parties, (pages 27 and 28 of the record,) showing their respective numbers, the particular bonds from which they were cut, and the several dates at which they matured. They were obtained by said Gest under the following circumstances, viz.: After acquiring a majority of the company stock, Gest selected his own directory, which consisted mainly of his brother, his nephew, and his clerks; took practically the exclusive control of the company, and exercised absolute authority over its business and finances. During his connection with the company as superintendent and sole managing and financial agent,—extending from October, 1870, to February 17, 1882, inclusive,—earnings of the road to the amount of $682,996.91 were received by him. These moneys were in no instance and at no time deposited to the credit of the company, or to the credit of said Gest as agent or treasurer of the company, but were treated as his own funds; were deposited to his individual credit just as other private funds; and when needed to meet the bills and debts of the company were drawn and paid out on his individual checks. Coupons and current bills for supplies furnished the company were paid in the same manner by his individual checks on the deposits in bank there made, which included both his individual funds and those derived from the receipts and earnings of the company. The earnings of the company were received, used, and appropriated by said Gest as being entirely his own, and were checked out and applied by him as he deemed proper. He took charge of the receipts and earnings of the company, blended them with his private funds, kept them in the hands of his private clerks, and on deposit in bank as his individual and absolute moneys, and dealt with them as such. The coupons maturing from and after July 1, 1870, to July, 1874, inclusive, were taken up, sometimes with cash paid therefor by Gest's clerk into whose hands the company's daily earnings first came, and in some instances by the individual checks of said Gest. These coupons were surrendered to the company and canceled, and are not in controversy in this case. These coupons were presented and paid at the company's office in Cincinnati. Certain coupons were presented for payment in 1871 at the Bank of America in New York, and protested for non-payment, no funds being then or afterwards placed there to meet said coupons; and thereafter said Gest, as the officer of the company, charged with the duty of applying the company's receipts to the payment of its liabilities, including past due coupons, gave notice to holders of bonds to present their coupons for payment after maturing at the company's office in Cincinnati, and in pursuance of this direction they were duly presented there. In 1873 several holders of coupons—Bullock, Lewis, Cook, Sherlock, and Kellogg—refused to transfer their coupons, or to receive the money therefor and surrender them, except upon the condition that they were canceled on the company's books. On March 13,

1873, Kellogg wrote from New York to J. J. Gest, the agent, and brother of E. Gest, and secretary of the company, as follows:

"DR. SIR: Yours of the 6th inst., after detention in Covington,—then in Madison,—at length reached me here this morning. In response I can only say that myself together with other Cincinnati bondholders have placed our coupons in the hands of Jno. R. Sage, Esq., for settlement or collection, which step was taken with a view to cancel, instead of transferring, the coupons. I refer you to Mr. Sage, with whom you can no doubt make satisfactory arrangements. Hereafter I can regularly send you coupons through bank, and hope that our future business relations may be mutually pleasant.

[Signed]                                    "CHARLES H. KELLOGG."

The coupons were accordingly taken up, canceled, and handed over to he company by said Gest or his clerk, Fuller. These coupons, maturing after July, 1870, and before January 1, 1875, Gest claims to have purchased from the holders thereof, and to have been by him surrendered to the company from time to time, as it was in funds to take them up. This claim is not supported by the evidence, nor by the contemporaneous entries upon the books of the company, or the annual reports of said Gest. On the contrary, the fact is fully established that they were never sold to him, but were, in the first instance, paid directly to the holders thereof, who surrendered them to the company. Between January 1, 1875, and February 17, 1882, past due coupons to the number of 455 were presented for payment at the company's office in Cincinnati, and were taken up by said Gest or his clerks in some instances with cash and in others with his individual checks on banks in which he had made the commingled deposit of his own and the company's funds, in the same way that the coupons maturing before January 1, 1875, had been paid and taken up. The evidence establishes the fact that these 455 coupons were in no instance sold or transferred by the several holders thereof to said Gest, nor were they aware that he was buying or claiming to be the purchaser of them. The holders in every instance presented them for payment, and when they received the money on and for them, supposed they were paid and taken up by the company. They neither knew or had reason to know or believe that said Gest was taking up and holding said coupons on or for his individual account. Gest never so informed them, and there was nothing brought to their notice during the period of said transaction from which they should reasonably have inferred that the coupons were being bought by Gest rather than paid by the company. The funds used in taking up these 455 coupons, whether by cash or by Gest's private check, consisted of the improperly blended and commingled moneys of the company and of said Gest. The state of his account with the company at the several and respective dates on which said coupons were taken up as aforesaid is not disclosed, and there is nothing to show that there were not at said respective dates funds of the company in his hands properly applicable to the payment of said coupons. These coupons were cut chiefly from bonds held by certain parties in New Haven, Conn., called in the record the "New Haven Holders," to whom Bushnell had transferred his 48 bonds in the latter part of 1870, and by Bullock, Cook, Lewis, Sherlock, and Garrick, and Charles

H. Kellogg, 331 of said 455 coupons being cut from the bonds of said Kellogg. The proof clearly establishes that Kellogg never sold or intended to sell or transfer said coupons to said Gest, as claimed by the latter, and such is the established fact in reference to the other holders. Said holders, nor either or any of them, were ever informed that Gest was claiming or asserting the right to take them up for his private benefit and account. There were no circumstances connected with their payment calculated to give the holders any notice of such fact, or that Gest was acting in the premises otherwise than as the financial agent of the company, whose duty it was to take up said coupons for and on account of the company. The holders were postponed from time to time in obtaining payment by the statement of Gest and his clerks that they must wait till the company earned the money with which to pay their coupons, and in most instances they were paid off in installments, or, as expressed by one witness, in "driblets." These coupons were not canceled, but were held by said Gest till sold and transferred under said contract of February 17, 1882. In view of Gest's relation to the company; of his duty as its financial agent, to receive and apply its earnings to the payment of its debts, including coupons as they matured; of the fact that said earnings were not only received by him, but were mingled, blended, and confused with his private funds; and of his failure to show how his accounts stood with the company at the several dates when said coupons were taken up,—there is no presumption of ownership arising from his retention or holding possession of said coupons. If, however, such an inference could properly be made, the court finds as a fact clearly established by the evidence that said Gest did not become the owner of said 455 coupons by purchase, transfer, or assignment from the holders thereof, either before or after the maturity of the same, and that in his hands said coupons, if not actually paid with the funds of the company, constituted nothing more than vouchers for sums paid out by him for or on behalf of the company. The court further finds that, pending the negotiations for their sale and purchase, the said Gest made the fraudulent representations in regard to them already noticed, and by the contract under which they were transferred to plaintiff warranted them to be unpaid coupons belonging to himself, and entitled equally with all other outstanding coupons and first mortgage bonds to a first lien on the mortgage security, as above explained. The court accordingly finds that these 455 coupons were not unpaid in the way warranted or untruthfully represented by said Gest, and that as to them as well as the 313 coupons already referred to, there has been a breach of warranty, and such fraudulent representations as entitles the plaintiff to recover on both of said grounds.

After negotiations had been commenced for the purchase of his interests in the company, said Gest, on the 18th June, 1881, procured the passage by the board of the following resolutions:

"Whereas, the board of directors of this company, by a resolution passed on the 3d day of October, 1870, appointed Erasmus Gest, Esq., general superintendent of all its affairs, with power to collect and disburse moneys, pay

debts, and attend generally to the management and control of the company's business; and, whereas, the said Gest has continued to act as such general superintendent from that time to the present, and is still so acting, and has, at the instance and request of this company, and in order to protect its credit and to save its property, paid out of his own means large sums of money to defray expenses incidental to the operating of its railway, and has at various times purchased and paid for, and now holds, coupons or interest warrants and other obligations and liabilities of the company to a large amount; and, whereas, all of said payments and purchases were made by said Gest with the understanding that he should be with respect to the same entitled to all the rights and remedies belonging to the original holders of said debts, obligations, and liabilities: Now, therefore, resolved, that the said Erasmus Gest be and is hereby substituted for and in the place of the original holders and owners of all the debts, coupons, obligations, and liabilities heretofore paid and purchased by him as aforesaid, and he shall be entitled to have and to enforce for the collection of the same all the liens and other securities held by such original holders or owners; and in case he shall hereafter pay off or purchase any other debt, obligation, or liability of this company, he shall, as to such debts, obligation, or liabilities be substituted for the original holders thereof, and be entitled to the benefit of all liens and remedies belonging to them, it being the intention hereby to execute the agreement and understanding heretofore existing between said Gest and this company, and to continue the same in full force so long as he shall make payments and purchases as aforesaid.

"No other business, upon motion adjourned.

"J. HENRY GEST, President.

"Jos. J. GEST, Secretary."

—Which is relied on by defendant as establishing his ownership of said coupons. But the resolutions, passed after most of said coupons were actually taken up, cannot have that effect, for its recital, so far as they relate to his purchase of said coupons are not true in point of fact, and are not entitled to any more weight than his own statement. It was passed at his instance and to serve his purpose. It neither changes nor controls the actual facts as herein found by the court.

In the latter part of October, 1881, Amos Shinkle, trustee as aforesaid, recovered in the chancery court of Kenton county, Ky., two judgments against the Covington Street-Railway Company, for $1,282.12, and the other for $4,703.35, on past due coupons for the use and benefit of C. W. West, the holder of the coupons involved in the suit. These two judgments were paid in November, 1881, by William Ernst, the company's surety on the appeal or *supersedeas* bonds given in the progress of the cause. Said Ernst became surety at the instance and request of said Gest, who furnished or refunded to Ernst the amounts paid by him in satisfaction of said judgments. At the time of tendering payment of said judgments, said Ernst moved the court to subrogate him to the rights of the complainants therein against the company. This was opposed by complainants, and was denied by the court. These judgments were thereupon paid, and Ernst, having been refunded the sums advanced by him, soon thereafter assigned and transferred to said Gest "all right, title, and benefit in and to the payment" so made by him. The city of Covington in the fall of 1881 also obtained a judgment against

the company, on which said Gest for and on behalf of the company made a partial payment of $1,029.53. These three judgments were transferred to plaintiff under the contract of February, 1882. That contract contained no warranty on the part of said Gest as to said judgments, nor does the evidence establish any misrepresentation on his part in regard to them. He assigned and transferred what he undertook to sell. The written transfer which he made, and which plaintiff accepted without objections, recited the facts as to said judgment fully and correctly. Plaintiff is not, therefore, entitled to any recovery in report to said judgments.

On the foregoing facts the court is of the opinion that this case is clearly distinguishable from, and is not controlled by, the decision of the supreme court in the case of *Ketchum* v. *Duncan*, 96 U. S. 671; that it falls rather within the principle laid down and applied in the cases of *Com.* v. *Canal Co.*, 32 Md. 501; *Haven* y. *Depot Co.*, 109 Mass. 88; *Trust Co.* v. *Railway Co.*, 63 N. Y. 311. It may be that, upon an adjustment of the accounts between said Gest and the company, (the Covington Street-Railway Company,) said 768 coupons would not be treated as extinguished in law and in fact as between them. They might possibly be regarded as between him and said company as vouchers or evidences of amounts advanced or paid out for on behalf of the company. But as against other valid and subsisting lien claimants, such as the first mortgage bonds and unpaid coupons, they clearly had no concurrent equity or right to share in the mortgaged property or its proceeds.

The conclusion of the court is that plaintiff is entitled to a recovery against the defendant in respect to the 768 coupons, both upon the breach of warranty and for the fraudulent representations and suppression of the truth, by means of which plaintiff was induced to make the purchase, was deceived and misled, to its injury. There being no evidence as to the market value of the coupons at the date of sale, the price paid by the purchaser will be considered the market value in estimating the damages under the breach of warranty, as held by the supreme court in the case of *Smeltzer* v. *White*, 92 U. S. 395, and cases there cited. These coupons were tendered back to the attorneys of the defendant on the 16th July, 1886, who declined to accept them, and thereafter plaintiff brought them into court to be surrendered and delivered up to the defendant as the court might order and direct. The measure of damages in the cause of action based upon the fraudulent misrepresentation and concealment of material facts on the part of defendant, will, under the circumstances of the case, be the price for the coupons and interest on said sum.

The plea of the statute of limitations to the amended petition setting up this second ground of recovery is not well taken, as said amended petition was filed within four years after the fraud was discovered by the plaintiff.

The court finds and adjudges that the defendant is entitled to the set-off claimed in his answer, viz., $1,067.20, with interest thereon from June 16, 1883; $150, with interest since March 1, 1884; and $150, with interest since September 1, 1884; the two last amounts being for coupons

of bonds issued by plaintiff and which the defendant will be required to deliver up to the clerk of this court for cancellation. Judgment will be rendered, and is hereby directed, in favor of the plaintiff against the defendant for the sum of $35,039, being the amount paid for said 768 coupons, with interest thereon at the rate of 6 per cent. per annum from July 1, 1882, which is about the average date of payment. The set-offs allowed defendant will be credited on, and be deducted from, the amount of this judgment, and the plaintiff will have execution against the defendant for the balance with costs of suit.

To each and all of said findings and conclusions of law the defendant excepts.